In the Matter of the MARRIAGE OF Antoinette DeVINE and John DeVine.

No. 07–92–0111–CV.

Court of Appeals of Texas, Amarillo.

Oct. 1, 1993.

Rehearing Overruled Feb. 24, 1994.

Ann C. McClure, El Paso, Amy Ganci, Dallas, for appellant.

Thomas P. Goranson, Dallas, for appellee.

Before REYNOLDS, C.J., and DODSON and POFF, JJ.

## ON SECOND MOTION FOR REHEARING

POFF, Justice.

In his second motion for rehearing, John DeVine complains of our original opinion issued May 10, 1993, and our opinion on his first motion for rehearing issued June 29, 1993. Upon consideration of the motion, we grant the second motion for rehearing, withdraw both our original opinion and our opinion on first motion for rehearing, and substitute this opinion and judgment in lieu thereof.

After 48 years of marriage, John DeVine [Jack] sued his wife Antoinette [Rita] for divorce. Following a trial to a jury, the court granted the divorce, finding that Rita had committed adultery. By ten points of error, Rita challenges certain jury findings,

the court's award of various damages and the court's division of the parties' community estate.

Jack and Rita [collectively, the DeVines] were married in 1942. They had two daughters and a son. For most of their marriage, Jack was employed as an airline pilot while Rita did not work outside the home. Jack retired in 1977. At the time of the divorce, Jack was 72 years of age and Rita was 67 years of age.

In the early 1970s, the DeVines began investing in real estate in Dallas. Their investments proved to be quite successful; at one time they owned as many as 50 condominiums.

In 1983, the DeVines invested $25,000 in a development called Turtle Creek Place that was to be a "big high rise luxurious hotel health club." One of the principal developers of Turtle Creek Place was a man named Jack Counts [Counts]. Counts developed real estate in Dallas and Denver and he owned several nursing homes. The DeVines met Counts through their daughter, Sandy DeVine [Sandy], who was employed as a nurse at one of Counts' nursing homes.[1] Rita was interested in getting involved in Turtle Creek Place. After meeting Counts, the DeVines made their $25,000 investment in Turtle Creek Place. Due to a lack of financing, however, the development never materialized and the DeVines lost their $25,000 investment.

The DeVines were not the only persons who lost money on Turtle Creek Place; Counts lost $5 million he had invested in the development, forcing him into bankruptcy. Counts continued to make investments after his bankruptcy, however, by investing in the name of his wife, Jane Counts [Jane]. Jack and Rita were often co-investors.

Undeterred by the Turtle Creek debacle, the DeVines invested in a 1986 Counts high-rise condominium project in downtown Denver known as Denver Suites. Counts, through his wife Jane, invested $58,000 in the project while Jack and Rita invested $56,000. Their combined $114,000 investment was, in effect, a down payment on an existing building that was to be converted into condominiums. The building had originally been built by Counts in 1983 but had been taken over by the Federal Savings & Loan Insurance Corporation (FSLIC). Further financing for the building could not be obtained, causing Counts and the DeVines to forfeit the down payment.

Another regrettable 1986 venture in which the DeVines invested was Denver Plaza. In pursuit of the project, the DeVines, along with a man named Charles Steadman, attempted to purchase a Denver office building owned by Counts. Counts did not invest in the project. The purchase was never completed and the DeVines lost their $25,000 investment.

Also in 1986, the DeVines invested $20,000 in a corporation called Sundance Trading. According to Counts, the corporation was formed to find sources of financing for other projects. Sundance Trading was the brainchild of Harry Hines, a Denver stockbroker and the boyfriend of Sandy's manicurist. The DeVines lost all of the money they invested in Sundance Trading. Counts likewise lost his $15,000 investment.

Jack testified that in 1987 he and Rita invested $25,000 in a Counts plan to build ten hotels. Each hotel would contain 140 suites and would be known as 140 Place. Jack was named president of a corporation formed in conjunction with the 140 Place investment.[2] Once again, the project never came to fruition, and the DeVines lost their entire $25,000 investment. In connection with the 140 Place project, another corporation, Korrs Investments, was established. Jack knew nothing of Korrs Investments.

---

1. Sandy had since 1982 been engaged in an adulterous sexual relationship with Counts. Sandy had informed her mother of her relationship with Counts. Rita disapproved, however, of Sandy's relationship with Counts because Counts was a married man. At the time of trial, Sandy and Rita were still estranged.

2. Jack was fully cognizant that he was the president of this corporation. However, Jack testified that, without his knowledge, he had previously been named as a director of corporations formed in conjunction with other of the investments described above.

The DeVines never made a penny investing in Counts' various schemes. In fact, they lost a total of $151,000. Each time an investment was made in a Counts enterprise, Jack testified Rita encouraged and persuaded him to join in the venture.

In late 1989, Jack became aware that Rita was sexually involved with Counts. The record is not entirely clear as to when Rita and Counts first began their sexual relationship. Counts testified that he first had sex with Rita in May 1988. Sandy testified that although her sexual relationship with Counts lasted until December 1987, she suspected her mother was having sex with Counts as early as August 1986. Jack testified that he was convinced Rita and Counts became sexual partners in 1986. Rita moved out of the bedroom she shared with Jack in 1986 and refused to have sex with him thereafter.

Regardless of when Rita became sexually involved with Counts, it is clear that Rita shifted her allegiance from her husband to Counts in 1985. Rita had stayed in frequent contact with Counts since their initial meeting in late 1983. In July 1985, Counts invited Rita to use an office at the Crestview Nursing Home in Dallas. Counts also maintained an office there. This was the beginning of a daily working relationship between Rita and Counts that developed into much more.

Rita testified that a big change took place in her life in 1985. The change had to do with her study of astrology. A tape recording of a September 15, 1987 conversation between Rita and her astrologer, Laura Carl-

son [Carlson], was played for the jury. In that tape recording, Rita stated that she separated from her husband in her heart, although not physically, in October 1985. Rita's exploration of astrology led to an experience on May 16, 1987, in which Rita claimed to have been contacted by a spirit entity named Master Korr. This spirit was her master.[3] Rita is known to Master Korr as Beth.

Although Rita did not relate this event to her husband, she did share the experience with Counts. Counts had dabbled in astrology for nearly 30 years. From May 16, 1987 forward, Rita and Counts held several "channeling" sessions each week in which they contacted Master Korr. Counts would assist Rita in going into a trance. Then Master Korr, using Rita's voice, would speak. Hundreds of these channeling sessions were tape-recorded and the recordings were transcribed.

In August 1987, Rita and Counts were able to contact Counts' master—Master Todlee—through a Ouija board. Counts is known to his master as Able. On October 5, 1987, Master Todlee began speaking through Rita.[4] Counts and Rita continued to contact both spirits over the course of the succeeding two years. The spirits instructed Rita and Counts to put the transcribed recordings in book form. Rita and Counts did so, publishing the book "Black Diamonds" in July 1989.

Through their masters, Rita and Counts learned that they had shared several lives together through the ages. In fact, Master

---

3. According to the book "Black Diamonds" (discussed later in this opinion):

Master Korr was created with her soul mate "in the beginning". [sic] She lived many lives during that period of the first million years of man on earth, sometimes as a male and sometimes as a female. Somewhere along the line she became a healer. She remembers lives in Lemura as a male physician. She remembers lives in the first Atlantis as a fisherman and as a physician. She remembers a life in the Andes as an Indian Chief's wife during the sixth world when the tops of the Andes were only 10,000 feet high. She remembers a life time in Israel during the life of Jesus Christ as a physician and a shepherd. Her last life on earth was in 1600 when she was a tall, black-robed gentleman with gray hair and a gray

beard carrying a large crystal ball. Again, she was a healer and a prophet.... Today, Korr works from the house of Opals on the fifth plane and she is a healer. She comes to Beth [Rita] to heal through her.

4. Master Todlee is described in "Black Diamonds" as an "alien"

from the planet "Iris".... Today, Todlee works from the house of Black Diamonds on the fifth plane and from his planet Iris which he visits periodically by thought. His mission is to bring the book [Black Diamonds] to mankind and keep Able [Counts] alive to write it. He also tells Able [Counts] he is here to assist him in building those structures Able [Counts] is destined to build on earth before he leaves this time.

Todlee told them they had been romantically involved with each other in other lives dating back 400 million years to the time Counts and Rita were both in a clam shell. It is clear that by the summer of 1987, Rita considered Counts to be her soul mate and her true partner.

In her September 1987 tape-recorded session with the astrologer Carlson, Rita and Carlson discussed how Jack was a thorn in Rita's side and a disruptive influence in her efforts to contact Master Korr. Carlson told Rita that because Jack was born a Scorpio in 1917, he had a fear of the occult. Indeed, Jack testified he did not believe in the occult. Carlson informed Rita that she had "honed in" on the right partner for her in 1985 or 1986 and that she would "hook up" with her new partner by the end of 1988. This new partner, Counts, was, according to Carlson, the type of man that Rita should have been with all along. Rita told Carlson there was bad karma at her home and that she wanted to be away from home as much as possible. During 1988 and 1989, it was Rita's daily practice to leave for her office about 5:30 a.m., return home 12 hours later, cook a quick dinner for Jack and then retire to her bedroom until the next morning.

On October 7, 1987, Counts and Rita set up a new corporation, Korrs Investments, for the purpose of writing and financing the "Black Diamonds" book and also to finance and construct the ten 140 Place hotels.[5] Rita was issued 998 shares of the original 1000 shares of stock. The DeVines' son, John A. DeVine [John], and their youngest daughter, Deborah DeVine [Deborah], were each issued one share of stock. Rita and Counts both attested that neither Rita nor John and Deborah ever paid anything for their stock. Rita was designated as the president of Korrs.

From its inception, Korrs borrowed money from the Dorchester of Turtle Creek—a corporation originally owned by Jane Counts and managed by Counts. Korrs used the borrowed money to develop the Black Diamonds book and to try and develop the 140 Place hotels. The record does not reveal how much money the Dorchester at Turtle Creek loaned to Korrs.

In 1988, Korrs entered into an oral management contract with GS Corporation—an Oklahoma corporation that owns six Glamour Shots studios in the Dallas area. Counts' son, Jack Counts, Jr. [Junior], is the principal owner of GS. Counts had originally loaned money to Junior to begin the corporation in 1972. Under the oral management contract, Korrs purchases jewelry, clothes and cosmetics that are used in the operation of the six Dallas area Glamour Shots studios as well as 66 other Glamour Shots studios across the United States. GS then reimburses Korrs for the expenses it incurs. Additionally, Korrs receives 25 percent of GS's net profits.

Beginning in September 1988, Rita worked several hours each week buying supplies that were used in the Glamour Shots studios. Rita was not compensated for her time until late 1989 when she received $1500 to $2000. In 1990 and 1991, GS Corporation paid Rita for her work at the rate of about $30,000 per year.

In addition to her work specifically for Glamour Shots, Rita was deeply involved with the day-to-day business of Korrs. Rita signed the lease agreement for Korrs' building, investigated real estate deals, signed numerous Korrs' checks and signed Korrs' federal income tax returns.

On November 14, 1989, Counts, Rita and attorney Robert Benson [Benson] formed a non-profit corporation known as The Way of the Light.[6] On December 1, 1989, Rita, John

---

**5.** The corporation's purpose was thus in line with Master Todlee's mission to bring "Black Diamonds" to mankind and to assist Counts in building the structures he was destined to build. *See* footnote 4.

**6.** According to Counts, Master Korr and Master Todlee instructed him and Rita that they were not to try and make money on the sales of the Black Diamond book. This was the reason un-

derlying the formation of the non-profit corporation.

The masters need not have worried. Although the book was advertised for sale in the Dallas Morning News and the National Enquirer, sales were admittedly less than brisk.

Counts testified that The Way of the Light was also formed in order to provide for the poor, the old, the hungry and children with shelters, nursing care and hospital care. At trial, Counts

and Deborah transferred their 1000 shares of Korrs stock to The Way of the Light. They received no consideration for their transfer of the stock. Thus, The Way of the Light acquired 100% of Korrs.

Jack originally filed for divorce on August 29, 1990. Depositions were taken and the issues involved in the impending court battle began to take shape. On April 8, 1991, Counts, Rita and Benson, as directors of The Way of the Light, met to acquire the Korrs stock. The directors had conveniently discovered that Rita, John and Deborah had never paid for their shares of Korrs stock and thus, in their view, the trio's December 1989 assignment of Korrs stock to The Way of the Light was invalid because they had nothing to assign. New Korrs stock was issued to The Way of the Light in exchange for $1000.[7]

From the time of its incorporation, Korrs paid virtually all of Counts' living expenses, including rent, medical expenses, life insurance, AARP insurance, clothing expenses, Hawaiian telephone bills and charge card payments. Korrs made many payments to Counts' illegitimate son and paid for all of the educational expenses incurred by Counts' illegitimate daughter. Korrs also paid the illegitimate daughter a monthly allowance and made the payments on her car. Similarly, Korrs made car payments for one of Counts' sons. Korrs also paid the mortgage on certain property used by Counts' wife and children in Colorado.[8]

Counts maintained that all of Korrs' payments for his personal expenses constituted reimbursement for the loans to Korrs from the Dorchester at Turtle Creek. Counts also stated that Korrs paid for his illegitimate daughter's college education "because Korrs gives a scholarship to people who need an education." Counts admitted, however, that his daughter was the only person to ever have received a scholarship from Korrs.

admitted that The Way of the Light had provided none of these things.

7. Apparently, the $1000 was paid to Korrs. We note that it does not appear the directors of The Way of the Light were empowered to issue Korrs stock.

Korrs' 1987, 1988, 1989 and 1990 federal income tax returns show losses of $68.45, $136,895.97, $157,178.58 and $55,001.06 respectively. We cannot discern from the record whether these losses represent an honest accounting. It is clear, however, that a substantial amount of money flowed through Korrs' bank accounts in those years. The record shows that more than $1,390,000 was deposited in Korrs' bank accounts through January 1991.

At the time of trial, The Way of the Light continued to own Korrs. Counts, Rita and Benson still continued to function as The Way of the Light's board of directors. Rita remained active in Korrs' business activities, particularly those involving the operation of the Glamour Shots studios.

■ In her first point of error, Rita contends there is no evidence, or in the alternative, factually insufficient evidence to support the jury's findings that (1) she committed actual fraud with respect to Jack's community property rights and that (2) $100,000 would fairly compensate the DeVines' community estate for her actual fraud. We will first resolve Rita's no evidence claim. In doing so, we must examine the record in the light most favorable to the finding to determine if there is any probative evidence, or reasonable inferences therefrom, which support the finding, and we must disregard all evidence or reasonable inferences therefrom to the contrary. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 276 (Tex.App.—Amarillo 1988, writ denied). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *In re King's Estate*, 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951).

■ In the present case, the jury was instructed in accord with the following pattern jury charges.

8. For the greater portion of the 1980s, Counts was separated from his wife Jane. They were divorced about a month before the current case went to trial.

A spouse commits [actual] fraud if that spouse transfers community property or expends community funds for the primary purpose of depriving the other spouse of the use and enjoyment of the assets involved in the transaction. Such fraud involves dishonesty of purpose or an intent to deceive.[9]

A relationship of confidence and trust exists between a husband and wife with regard to that portion of the community property that each controls. This relationship requires that the spouses use the utmost good faith and frankness in their dealings with each other.

Because of the nature of the spousal relationship, conduct of a spouse affecting the property rights of the other spouse may be fraudulent even though identical conduct would not be fraudulent as between non-spouses.

Rita did not object to the court's charge. Thus, even if, *arguendo,* the court's instructions did not accurately state the law, any complaint concerning the instructions was waived. Tex.R.Civ.P. 274.

■ The record clearly contains evidence that Rita did not "use the utmost good faith and frankness" in dealing with Jack. In encouraging and persuading Jack to invest in Counts' various projects, she did not tell Jack of her close personal involvement with Counts. It is entirely reasonable to infer from the evidence that Rita was sexually involved with Counts at the time she and Jack invested $56,000 in Denver Suites, $25,000 in Denver Plaza, $20,000 in Sundance Trading and $25,000 in 140 Place. It can also be readily inferred that Jack would not have agreed to invest in the foregoing projects had Rita informed him of the true nature of her relationship with Counts. Jack testified that his wife strongly influenced his decision to invest. It is evident that Jack relied on his wife's judgment, unclouded by any ulterior motives, in making his investment decisions.[10] There is no question the jury had evidence before it by which it could have rightfully concluded that Rita's conduct evidenced an intent to deceive and was outright dishonest. By persuading her husband to invest community funds in Counts' various schemes without informing Jack of her true relationship with Counts, Rita perpetrated an actual fraud.

The jury's finding that $100,000 would fairly compensate the community estate for Rita's actual fraud is also supported by some evidence. Rita's contention that there was no evidence to support the jury's findings is unavailing.

Similarly, Rita's contention that the evidence is insufficient to support the jury's findings must fail. "In reviewing an insufficient evidence point, we must examine the entire record to determine if there is some probative evidence to support the finding, and, if there is, we must determine whether the evidence supporting the finding is so

---

9. This jury charge is an accurate statement of the law. *See Horlock v. Horlock,* 533 S.W.2d 52, 55 (Tex.App.—Houston [14th Dist.] 1975, writ dism'd). As between spouses, the six traditional elements of actual fraud need not be shown. In a traditional fraud cause of action, a plaintiff must show: "(1) that a material representation was made; (2) that it was false; (3) that when the speaker made it he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; (6) that he thereby suffered injury." *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977).

10. On direct examination, Jack testified as follows:

Q. Did your wife encourage you to make these investments?
A. I think she influenced me very much.

Q. Did she—
A. She pushed me into them I am convinced.
Q. Did you usually sign the actual checks?
A. Pardon?
Q. Would you often actually sign the checks?
A. I signed them, she signed them, yes.
Q. Well, why would you sign those checks, Mr. DeVine?
A. Why did I sign them?
Q. Yes, sir.
A. She wanted me to get into those schemes, these investments.
Q. Did you always do what your wife wanted you to do?
A. Pretty much so.
Q. Did you know at the time that you were making these investments that your wife was involved in an affair with Jack Counts?
A. I did not.

weak or the answer so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d at 276. We have already determined there is some evidence to support the jury's findings. A view of the entire record does not convince us that the jury's findings are clearly wrong or manifestly unjust. Accordingly, the evidence is sufficient to support the jury's findings. Point of error one is overruled.

In her second point of error, Rita contends there is no evidence, or in the alternative, factually insufficient evidence to support the jury's findings that (1) she committed constructive fraud with respect to Jack's community property rights and that (2) $400,000 would fairly compensate the DeVines' community estate for her constructive fraud. The trial court instructed the jury in accord with 5 State Bar of Texas, Texas Pattern Jury Charges PJC 206.03A (1992) as follows:

A spouse may make moderate gifts, transfers, or expenditures of community property for just causes to a third party. However, a gift, transfer, or expenditure of community property that is capricious, excessive, or arbitrary is unfair to the other spouse. Factors to be considered in determining the fairness of a gift, transfer, or expenditure are:

1. the relationship between the spouse making the gift, transfer, or expenditure and the recipient;

2. whether there were any special circumstances tending to justify the gift, transfer, or expenditure; and

3. whether the community funds used for the gift, transfer, or expenditure were reasonable in proportion to the community estate remaining.

The foregoing instruction is an accurate statement of the law. *See Mazique v. Mazique*, 742 S.W.2d 805, 808 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Carnes v. Meador*, 533 S.W.2d 365, 370 (Tex.Civ.App.—Dallas 1975, writ ref'd n.r.e.).

■ A presumption of constructive fraud arises where one spouse disposes of the other spouse's interest in community property without the other's knowledge or consent.

*Mazique v. Mazique*, 742 S.W.2d at 808; *Jackson v. Smith*, 703 S.W.2d 791, 795 (Tex. App.—Dallas 1985, no writ); *Carnes v. Meador*, 533 S.W.2d at 370. The burden of proof then shifts to the disposing spouse to prove the fairness of the disposition of the other spouse's one-half community ownership. *See Mazique v. Mazique*, 742 S.W.2d at 808; *Jackson v. Smith*, 703 S.W.2d at 795; *Redfearn v. Ford*, 579 S.W.2d 295, 297 (Tex.Civ. App.—Dallas 1979, writ ref'd n.r.e.); *Carnes v. Meador*, 533 S.W.2d at 370; *Murphy v. Metropolitan Life Ins. Co.*, 498 S.W.2d 278, 282 (Tex.Civ.App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.). The trial court correctly instructed the jury that "[t]he burden of proof to show the fairness of any gift, transfer or expenditure is upon the spouse who is responsible for the gift, transfer or expenditure."

Following its instructions, the court asked the jury Question 10: "Was a transfer made by Rita DeVine to any third party unfair to Jack DeVine?" The jury answered affirmatively. The jury was then asked Question 11:

What sum of money, if paid in cash, would fairly and reasonably compensate the community estate of Jack DeVine and Rita DeVine for the damages, if any, resulting from the transfer or transfers made by Rita DeVine to third party or parties?

The jury's answer was $400,000.

While the jury's answer confirms an unfair transfer or transfers, it does not specify which of the many transfers the jury determined to be unfair to Jack. Neither does the $400,000 answer which transfers the jury deemed unfair. Consequently, we will examine the transfers of stock, money and other items of value. We will thus test the legal and factual sufficiency of both the Korrs stock transfer and the transfers from the Korrs bank accounts for the benefit of Counts.

■ Initially, we will consider whether Rita's transfer of her Korrs stock to The Way of the Light was an unfair transfer of community property. Rita contends that "the community estate never owned an interest in the Korrs stock, thus there could be no fraudulent or unfair transfer of community

property." Rita does not argue that the stock transfer was fair. Accordingly, our analysis centers on whether the community estate owned an interest in Korrs. Jack bears the burden of proof on this specific issue.[11] Because Jack has the burden of proof, Rita's challenges to the legal and factual insufficiency of the jury's answers to Question 10 are properly denominated as "no evidence" and "insufficient evidence" points, respectively. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d at 275–76.

In addressing Rita's contention that there is no evidence to support the jury's finding of an unfair transfer of Korrs stock, we must examine the record in the light most favorable to the finding to determine if there is any probative evidence, or reasonable inferences therefrom, which support the finding, and we must disregard all evidence or reasonable inferences to the contrary. *Id.* at 276. If there is any evidence of probative force to support the finding, the finding must be upheld. *In re King's Estate*, 244 S.W.2d at 661.

As noted earlier, Rita testified she did not pay any money for her 998 shares of Korrs stock. Because of this non-payment, Rita contends that the issuance of Korrs stock was invalid. Therefore, Rita argues, she and Jack never owned any interest in Korrs Corporation. We disagree.

Article V of Korrs' articles of incorporation provides:

> The corporation shall not commence business until it has received for the issuance of its shares, the consideration of the value of One thousand and no/100 [$1,000.00] dollars, consisting of money, labor done, or property actually received.

The record is clear that the corporation commenced business in October 1987. This gives rise to an inference that Korrs received consideration worth $1,000 before commencing business. Rita was heavily involved in attempting to find financing for the ten 140 Place hotels. As mentioned earlier, the purpose of Korrs was to write and finance "Black Diamonds" and to finance and construct the ten 140 Place hotels. Thus, evidence exists which shows (1) Rita performed labor easily worth $1,000 in exchange for her 998 shares of Korrs stock; (2) the issuance of Korrs stock to Rita was valid; (3) Rita and Jack owned an interest in Korrs stock; and (4) Rita's transfer of her Korrs stock to The Way of the Light was unfair to Jack. Accordingly, Rita's contention that there is no evidence to support the jury's finding that she committed constructive fraud with respect to Jack's community property rights by her transfer of the Korrs stock must fail.

In considering Rita's insufficient evidence point, we must consider the evidence contrary to the jury's finding as well as the evidence in support of the jury's finding. Having just determined that there is some evidence to support the jury's finding, we must now determine whether that evidence is so weak or the answer so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d at 276. In this case, both Rita and Counts unequivocally testified that Rita did not pay for her 998 shares of stock. Their testimony was self-serving, however, and the jury was entitled not to believe it. Furthermore, their testimony did not serve to explain why Rita's many hours of work during mid–1987 did not constitute labor performed as consideration for her receipt of the stock. Upon reviewing the entire record, we find that the evidence in support of the jury's finding that Rita committed constructive fraud with respect to Jack's property rights by her transfer of the Korrs stock is not so weak or so contrary to the overwhelming weight of the evidence as to be manifestly unjust. Accordingly, Rita's contention that the evidence was insufficient to support the jury's finding must also fail.

■ Before moving on to a discussion of whether there is sufficient evidence to support the jury's finding of an unfair transfer by Rita on the basis of transfers to Counts

11. Although the burden of proof to show the fairness of a transfer is upon the spouse responsible for the transfer, it is the burden of the complaining spouse to show that there was a transfer of community property in the first place.

from the Korrs bank accounts, we must address Rita's allegation that there is no evidence, or in the alternative, factually insufficient evidence to support the jury's finding that $400,000 would fairly compensate the DeVines' community estate for her constructive fraud. In effect, we are faced with the question of the value of the Korrs stock that Rita transferred to The Way of the Light. Because the value of the stock was known to Rita but not known to Jack, Rita had the burden of proving the value of the stock. "Where facts lie peculiarly within the knowledge of a party and cannot, in the nature of the case be known to his adversary, the party having the knowledge has the burden of proving such facts." *Eaton v. Husted,* 141 Tex. 349, 358, 172 S.W.2d 493, 498 (1943); *Spencer v. Pettit,* 17 S.W.2d 1102, 1107 (Tex. Civ.App.—Amarillo 1929), *aff'd,* 34 S.W.2d 798 (Tex.Comm'n App.1931). Thus, Rita's contention that there is no evidence to support the jury's finding that $400,000 would compensate the community estate for her constructive fraud is in reality a matter of law point. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d at 275–76. Similarly, Rita's insufficient evidence contention would more properly be considered as a "great weight and preponderance point." *Id.*

"In reviewing matter of law points, we must examine the record for evidence that supports the finding, ignoring any evidence to the contrary; and, if there is no evidence to support the finding, we must then examine the entire record to determine if a contrary proposition is established as a matter of law." *Id.* at 276. Our review of the record reveals the following evidence in support of the jury's finding that $400,000 would compensate the DeVines' community estate for Rita's constructive fraud. Between the incorporation of Korrs in October 1987 and the transfer of Korrs stock to The Way of the Light on December 1, 1989, Korrs deposited $405,750.71 in its bank accounts. In the thirteen-month period between December 1989 and January 1991, Korrs deposited $986,123.55 in its bank accounts. Thus, over the course of slightly more than three years,

Korrs made deposits totalling $1,391,874.26. The record reveals transfers from the Korrs bank accounts in the amount of $677,672.81. Also, the record conclusively shows that transfers in the amount of $172,649.12 were for Counts' personal benefit.[12] There is no accounting on the record of the other $714,201.45 deposited in the account. Because it was Rita's burden to show what happened to the $714,201.45, the absence of any evidence showing what happened to the money gives rise to an inference that the money was retained by Korrs. We note also that Korrs had a contract with GS Corporation providing for Korrs to receive 25% of GS's net profits.

From the foregoing facts, the jury could certainly have presumed that the Korrs stock had value of at least $400,000. There clearly exists evidence in support of the jury's finding and thus Rita's challenge to the finding on the basis of legal insufficiency must fail.

We now examine whether the jury's finding that $400,000 would compensate the community estate for Rita's constructive fraud is against the great weight and preponderance of the evidence. "In reviewing great weight and preponderance points, we must examine the entire record to determine if there is some evidence to support the finding, and then determine whether, in light of the entire record, the finding is manifestly unjust." *Id.*

Upon reviewing the record, it is apparent that Rita did not produce evidence showing that the Korrs stock was worth less than $400,000. Rita did not offer an explanation regarding the $714,201.45 in deposits that was not transferred out of the Korrs bank accounts. Nor did Rita offer evidence detailing the nature of $328,600.24 transferred from the Korrs bank accounts. These transfers may well have been at least partially for Counts' personal benefit. The nature of the transfers was known to Rita but was not known to John. Yet Rita provided no explanation concerning the transfers. We conclude that there was sufficient evidence introduced to establish that the value of the Korrs stock was $400,000.

---

**12.** As mentioned earlier, Korrs paid virtually all of Counts' living expenses.

Having determined that there is both legally and factually sufficient evidence to support the jury's answers to Questions 10 and 11, point of error two is overruled. Before leaving this point of error, however, we will examine whether there was sufficient evidence to support the jury's answers on the basis of transfers to Counts from the Korrs bank accounts.

The record shows that Rita made transfers from the Korrs bank accounts that were unfair to Jack and constituted a constructive fraud on the community estate. Rita does not dispute the jury's finding that these transfers were unfair. However, Rita does contend that there is neither legally sufficient evidence nor factually sufficient evidence to support the jury's finding that $400,000 would compensate the community estate for these unfair transfers.

As with the value of Korrs Corporation, the amount of money unfairly transferred from the Korrs bank accounts for Counts' personal benefit was peculiarly within Rita's knowledge. Consequently, Rita had the burden of proving the amount of the transfers was less than $400,000. "[W]here the managing spouse has received community funds, and the time has come to account for such funds, the managing spouse has the burden of accounting for their proper use." *Mazique v. Mazique*, 742 S.W.2d at 808. Rita's points on appeal would be properly designated as "great weight and preponderance" and "matter of law" points. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d at 275–76.

We will first address Rita's contention that the jury's $400,000 finding is contrary to the evidence as a matter of law. In accordance with previously-cited case law, we will examine the record for evidence that supports the finding and ignore any evidence to the contrary.

As mentioned previously, $1,391,874.26 was deposited in the Korrs bank accounts over the course of three years. At least $172,649.12 was transferred from the bank accounts for Counts' benefit. The character of another $505,023.69 transferred from the accounts is uncertain. For example, the record shows that a total of $174,655.51 was expended to pay credit card balances. The jury could have inferred that those expenses were for Counts' personal benefit. Similarly, the jury could have presumed that the balance of the deposits—$714,201.45—was unfairly transferred for the benefit of Counts. There was definitely some evidence in support of the jury's $400,000 finding. Rita's matter of law point is unavailing.

We now turn to Rita's contention that the jury's finding that $400,000 would compensate the community estate for her unfair transfers to Counts out of the Korrs bank accounts is against the great weight and preponderance of the evidence. Having already found some evidence to support the jury's finding, our inquiry requires us to determine whether, in light of the entire record, the jury's finding is manifestly unjust. *Id.* at 276.

In connection with the $174,655.51 transferred from the Korrs bank accounts to pay credit card balances, Counts testified that 99% of the expenditures were business related. But Rita never produced any other evidence detailing what had given rise to the credit card balances. Rita produced no evidence whatsoever concerning the $714,201.45 balance of deposits into the Korrs bank accounts. In short, Rita failed to account for the lion's share of the $1,391,874.26 in community funds deposited into the Korrs bank accounts. The jury's finding that $400,000 would compensate the community estate for Rita's unfair transfers out of the Korrs bank accounts is not against the great weight and preponderance of the evidence.

There is legally and factually sufficient evidence to support the jury's finding that Rita made an unfair transfer of community property to a third party on the basis of the transfer of the Korrs stock as well as on the basis of the transfers from the Korrs bank accounts for the benefit of Counts. There is also sufficient evidence to support the jury's finding that $400,000 would compensate the community estate for Rita's unfair transfers on both bases. Point of error two is overruled. Additionally, we overrule point of error three in which Rita claims that the jury's $400,000 finding was clearly excessive.

In its charge, the court instructed the jury that if it found Rita to have committed an actual fraud on the DeVines' community estate then to determine "[w]hat sum of money, if any, should be awarded against Rita DeVine as exemplary damages?" The jury found that sum to be $3,000. In her fifth point of error, Rita contends that the trial court erred as a matter of law in submitting the exemplary damage question. In her fourth point of error, Rita argues that the trial court erred as a matter of law in awarding exemplary damages against her for an economic tort committed against the community estate. We need not reach the merits of either of these points of error, however, because Rita failed to object to the submission of the exemplary damage issue at trial.

Rule 52(a) of the Texas Rules of Appellate Procedure demands that in order to preserve a complaint for appellate review, a party must have presented a timely request, objection or motion to the trial court and must have obtained a ruling on such request, objection or motion. In order to timely object to the submission of a question to the jury, a party must object to the charge by distinctly pointing out the grounds for the objection before the court reads the charge to the jury. Tex.R.Civ.P. 272, 274; *Texas Employers' Ins. Ass'n v. Neuman*, 379 S.W.2d 295, 296 (Tex.1964); *Dayton Hudson Corp. v. Altus*, 715 S.W.2d 670, 674 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), *cert. dismissed*, 481 U.S. 1073, 107 S.Ct. 2471, 96 L.Ed.2d 364 (1987). Otherwise, the objection is waived. Tex.R.Civ.P. 274; *Allen v. American Nat'l Ins. Co.*, 380 S.W.2d 604, 609 (Tex.1964); *Texas Employers' Ins. Ass'n v. Neuman*, 379 S.W.2d at 296; *George Pharis Chevrolet, Inc. v. Polk*, 661 S.W.2d 314, 316 (Tex.App.—Houston [1st Dist.] 1983, no writ). Points of error four and five are overruled.

In her seventh point of error, Rita challenges the exemplary damage award on the ground that there is no evidence or insufficient evidence to support the underlying award of actual damages. We have already determined that the evidence is both legally and factually sufficient to support the jury's actual damage findings. Consequently, we must overrule point of error seven.

In her sixth, eighth, ninth and tenth points of error, Rita contends that the trial court erred in the way it divided the community estate. In order to adequately address these points of error, we must examine the trial court's actions in dividing the estate.

The jury found that Jack should receive 60% of the total community estate and that Rita should receive the remaining 40% of the estate. A jury's finding concerning how the estate should be divided is only advisory. *Cockerham v. Cockerham*, 527 S.W.2d 162, 173 (Tex.1975). The division of property in a divorce action is exclusively within the province of the trial judge. *Massey v. Massey*, 807 S.W.2d 391, 398 (Tex. App.—Houston [1st Dist.] 1991, writ denied). The trial court is granted wide discretion in dividing the community estate in a just and right manner. *Id.*

In the present case, however, it is apparent to us that the trial court attempted to follow the jury's advisory finding. By our calculations, Jack was awarded 59.69% of the estate while Rita was awarded 40.31% of the estate. Rita would vehemently disagree with our conclusion as to the respective percentage awards. By Rita's accounting, she received only 11% of the assets of the estate—a percentage that, in her view, effectuates a grossly disproportionate division of the community estate.

The record shows that at the time of divorce, the community estate had actual assets of $1,024,718. These assets consisted of money in bank accounts, notes receivable, stocks and bonds, real estate, motor vehicles, income tax refunds, and retirement benefits. But this is not the entire community estate that the trial court divided as assets of the community estate. In addition to these actual assets, the trial court considered the amount of money the jury found both Rita and Jack had diverted from the estate.[13] Specifically, the court treated as community assets the $400,000 the jury found it would

---

**13.** The jury found that Jack had committed fraud with respect to Rita's community property rights in the amount of $12,000. Jack does not challenge the jury's finding.

take to compensate the community estate for Rita's constructive fraud, the $100,000 the jury found was necessary to compensate the estate for Rita's actual fraud, and the $12,000 the jury found necessary to compensate the community for Jack's fraud. The trial court also treated the jury's award of $3,000 in exemplary damages against Rita as a community asset. Thus, the court added to the community estate a total of $512,000 in what might be referred to as "misappropriated assets," as well as the $3,000 exemplary damage award. The total amount of the community estate divided by the court was $1,539,-718—the sum of the actual assets and the misappropriated assets.

The court awarded Jack assets valued at $919,091, which is 59.69% of the estate. Included in that amount was the $12,000 in misappropriated assets representing the amount the jury found necessary to compensate the community for Jack's fraud. Thus, Jack was awarded $907,091 in actual assets.

Rita was awarded assets totalling $620,627, or 40.31% of the community estate. Included in that amount was the $500,000 in misappropriated assets representing the amount the jury found necessary to compensate the community for Rita's fraud, as well as the $3,000 asset representing the exemplary damage award against Rita. Thus, the trial court awarded Rita $117,627 in actual assets.

Jack was awarded 88.5% of the actual assets while Rita was awarded only 11.5% of the actual assets. It is this fact of which Rita complains most bitterly. Rita alleges that she should have received 40% of the actual assets. She argues that the trial court erred in awarding her 40% of the total community estate and then effectively reducing that award by $503,000 for her tortious conduct. Rita contends that the jury took her tortious conduct into account by finding that she should receive only 40% of the community estate and that the jury did not intend that she end up with only 11% of the estate's actual assets.

Having provided a brief explanation of the manner in which the trial court divided Jack and Rita's community estate, we now turn to Rita's specific points of error. In her eighth point of error, Rita charges that there is neither legally sufficient evidence nor factually sufficient evidence to support the jury's finding that she should receive only 40% of the community estate. Rita hinges her argument on the supposition that the evidence is either legally or factually insufficient to support the jury's findings that she committed fraud. As we detailed earlier in our opinion, however, there is both legally sufficient evidence and factually sufficient evidence to support the jury's findings that Rita committed fraud upon the community estate. Consequently, Rita's eighth point of error cannot be sustained.[14]

In her ninth and tenth points of error, Rita complains of the trial court's methodology in dividing the community estate. Rita contends that the court's property division awards Jack a double recovery. She also argues that the division serves to punish her for her conduct and is not a just and right division of the community estate. Finally, Rita maintains that the trial court's division of property effectuates a grossly disproportionate division of the community estate.

A trial court has broad discretion in dividing the estate of the parties and this division should only be overturned where it constitutes an abuse of discretion. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex.1981); *Falor v. Falor*, 840 S.W.2d 683, 688 (Tex.App.—San Antonio 1992, no writ); *In re Marriage of DMB and RLB*, 798 S.W.2d 399, 406 (Tex. App.—Amarillo 1990, no writ). A trial court may consider fault when making a just and right division of a marital estate. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *Cluck v. Cluck*, 647 S.W.2d 338, 341 (Tex.App.—San

---

**14.** Rita advances an additional argument in her eighth point of error, alleging that there is no evidence, or, in the alternative, insufficient evidence to support the jury's finding that she receive only 15% of Jack's retirement benefits. Apparently, this particular argument is also prem-ised on the supposition that there was neither legally sufficient evidence nor factually sufficient evidence to support the jury's findings that she committed fraud. As we have explained, that supposition is mistaken and thus, Rita's argument is unavailing.

Antonio 1982, writ dism'd). We find no abuse of discretion here.

The case of *Belz v. Belz,* 667 S.W.2d 240 (Tex.App.—Dallas 1984, writ ref. n.r.e.) is instructive. In *Belz,* Lee Roy Belz sued his wife Barbara for divorce. Barbara filed a cross action against Lee Roy for divorce. In her petition, Barbara alleged in a separate count that Lee Roy had committed fraud on her community interest in the marital estate. The trial court submitted the fraud issue to the jury as a separate common law action in tort for fraud. The jury found that Lee Roy had defrauded the community estate. Barbara was awarded actual damages of $17,200, exemplary damages of $2,200, and attorney's fees of $10,000.

The Dallas Court of Appeals held that the trial court had erred in submitting the issue of Lee Roy's fraud as a separate cause of action. But, according to the appeals court, Barbara did have a claim for the value of her interest in the community property wrongfully displaced by Lee Roy. The court stated that the basis for Barbara's claim was "Lee Roy's fraud on the community which may be asserted, in the context of a divorce and property division, for the trial court's consideration in the division of the estate of the parties." *Id.* at 246. The court recognized that the doctrine of interspousal immunity had been abrogated by the Texas Supreme Court as to intentional torts, *see Bounds v. Caudle,* 560 S.W.2d 925 (1977), but explained that because Lee Roy had perpetrated fraud upon Barbara to the detriment of her interest in the community estate as opposed to her separate estate, *Bounds* did not call for the submission of Lee Roy's fraud as a separate cause of action. *Belz v. Belz,* 667 S.W.2d at 246.

The *Belz* court declared:

We know of no precedent in Texas for allowing one spouse to sue the other in tort for common law fraud, as a separate cause of action, based upon a depletion of the community estate prior to dissolution of the community estate, either by divorce or the death of one of the spouses. Rather, a claim of fraud on the community is a means to an end, either to recover specific property wrongfully conveyed, to recover, after the death of the donor spouse, from the donee the value of inter vivos gifts made by a spouse in fraud of the other's rights, or, as here, to obtain a greater share of the community estate upon divorce, in order to compensate the wronged spouse for his or her lost interest in the community estate. In the context of a divorce and property division, fraud on the community is a wrong by one spouse which the court may consider in its division of the estate of the parties and which may justify an unequal division of the property.

*Id.* at 246–47 (citations omitted). The court went on to hold that Barbara had "a right to recover, in conjunction with the property division, the value of her community interest in the property which the trier of fact finds to be depleted wrongfully from the estate." *Id.* at 247.

In the present case, the trial court's division of the marital estate was in accordance with *Belz.* The trial court's property division serves to compensate Jack for his lost interest in the community estate. To hold that Rita's fraud was taken into account by the jury's recommendation that Rita receive 40% of the marital estate, would be to render the jury's answers concerning the sum of money necessary to compensate the community estate for Rita's fraud a nullity. We disagree with Rita's contention that Jack was the beneficiary of a double recovery by receiving the benefits of the fraud judgements against Rita as well as a disproportionate division of the community estate in his favor. We find support in the case of *Massey v. Massey,* 807 S.W.2d at 398, wherein the wife received both a monetary judgment on a tort claim against her husband and an unequal portion of the community estate. The husband argued that this resulted in a double recovery by the wife but the appeals court disagreed.

■ We also find that the trial court's property division order did not serve to punish Rita. The supreme court has stated that a property division is not to be a punishment for the spouse at fault. *Young v. Young,* 609 S.W.2d 758, 762 (Tex.1980). Here, the trial court took fault into account in awarding Rita 40% of the estate. But this was not a punishment. Nor was it a punishment to award

the $500,000 in misappropriated assets to Rita as part of her 40% of the community estate. The jury found that it would take $500,000 to compensate the community for Rita's fraud. It cannot be said that the trial court's property division was for the purpose of punishment.

We do not agree with Rita that the trial court's property division effectuates a grossly disproportionate division of the estate. As mentioned earlier, Rita received just over 40% of the community assets. The fact that some of the assets awarded to Rita had been misappropriated does not make the property division disproportionate. The fraud judgment represents funds that Rita wrongfully depleted from the community. In effect, Rita made a pre-divorce unilateral division of the estate. Then she proceeded to give away $500,000. Points of error nine and ten are overruled.

In her sixth point of error, Rita charges that the trial court erred as a matter of law in awarding Jack "a property off-set/credit for exemplary damages" against Rita. We agree with Rita that the trial court erred in the way it treated the award of exemplary damages. While the court was correct in treating the $512,000 in misappropriated assets as part of the community estate, the court erred in treating the $3,000 exemplary damage award in the same manner. Unlike the $512,000 in misappropriated assets, the $3,000 exemplary damage award was never a community asset. The exemplary damage award should not have been added into the community estate. The more appropriate course of action would have been for the trial court to render a personal judgment against Rita in the amount of $3,000. Point of error six is sustained.

However, the trial court's error does not require reversal. Our rules of appellate procedure command that

No judgment shall be reversed on appeal and a new trial ordered in any cause on the ground that the trial court has commit-

ted an error of law in the course of the trial, unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case, or was such as probably prevented the appellant from making a proper presentation of the case to the appellate court.

Tex.R.App.P. 81(b)(1). We do not believe that the error caused rendition of an improper judgment or prevented Rita from making a proper presentation of her case. Indeed, Rita fares slightly better where the $3,000 exemplary damage award is treated as an asset of the community estate than where it is treated as a personal judgment against her. Had the $3,000 award been treated as a personal judgment, Rita would have been awarded $1,200 less than she received,[15] and she would have had a $3,000 judgment against her. Under this particular set of facts, reversal of the case would be inappropriate. The judgment of the trial court is affirmed.

---

15. Had the $3,000 exemplary award not been treated as a community asset, the community estate would have decreased in value by $3,000. Jack's portion of the community estate would have been decreased by $1,800 (60% of the decrease), while Rita's portion of the estate would have been decreased by $1,200 (40% of the decrease).