Opinion filed March 26, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed March 26,
2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                                                          No. 11-07-00169-CV 

                                                     __________

 

           GLENN ARNOLD
WRIGHT AND FARON GRYDER, Appellants 

 

                                                             V.

 

                                  JODIE
ILEANE WRIGHT, Appellee

 



 

                                        On
Appeal from the County Court at Law

 

                                                           Ector
County, Texas

 

                                                Trial
Court Cause No. CC-18,611

 



 

                                                                   O
P I N I O N

After
more than 26 years of marriage, Jodie Ileane Wright sued Glenn Arnold Wright
for divorce on March 14, 2006.  In an amended pleading filed on February 22,
2007, she asked for a disproportionate share of the community estate.  Because
Glenn had transferred to an employee, Faron Gryder, 49% of the shares in one of
their companies three days after she filed for divorce, Jodie named Gryder as a
co-respondent.  All three parties entered into a mediated settlement agreement
(MSA) in which they settled all disputes except that they reserved for trial
Jodie=s claim that the
transfer of stock to Gryder was a fraud on the community.








Glenn
and Gryder assert that the MSA limited Jodie to an actual fraud claim and that
she breached the MSA by amending her trial petition to include constructive
fraud.  Based on that premise, they argue that Glenn and Gryder had the right
to rescind the MSA.  We disagree.  The MSA reserved a Acause of action for fraud on the community@ that included fraud,
constructive fraud, and breach of fiduciary duty and was consistent with Jodie=s claim (before the MSA) to
a disproportionate share of the community estate.  We affirm the trial court=s award of $318,500 to
Jodie for Glenn=s
fraud on the community.  We remand for a determination of the appropriate
amount of attorney=s
fees that should be awarded to Jodie and for the trial court to reform the
decree of divorce pursuant to this opinion.

                                                               Background
Facts   

Jodie
filed for divorce on March 14, 2006.  On that same day, Glenn withdrew all the
funds from their bank accounts with Security State Bank.  He also withdrew the
funds in his individual savings account and those in Jodie=s savings account.  Glenn
admitted that he thought that Jodie was going to sue him for divorce and that
he had withdrawn the money Ato
protect [himself].@ 
Glenn said that he applied the funds to pay down a revolving line of credit the
company owed the bank.  Later, after Jodie complained to Security State Bank,
Glenn replaced the funds to her savings account.

Glenn
also acted quickly to transfer the titles to their jointly owned Harley
Davidson motorcycles.  He transferred the titles to their two sons, but Jodie
did not learn of Glenn=s
action until the boys arrived at their home to take possession of the
motorcycles.  Jodie said the only problem she had with the boys picking up the
motorcycles was that she knew what their dad had done and that she did not want
them to get into trouble for it.

Glenn
and Jodie owned five companies:  World Sealing Corporation; Shaneda Machine,
Inc.; Turbo Specialties & Machine Co., Inc.; Turbo Custom Components, Inc.;
and Permian Valve Repair, Inc.  They began Shaneda Machine in 1979 as a general
machine shop.  Shaneda Machine had revenues of $3.5 million in 2005 and
specialized in the repair of industrial compressors and pumps and large
industrial electric motors and generators.

On
March 17, 2006, three days after Jodie filed for divorce, Glenn transferred 49%
of the stock of Shaneda Machine to Gryder.  Gryder admitted that he did not pay
anything for the stock but maintained that the shares were for his services
over the past years as an employee of Shaneda Machine.  On that same day, Glenn
had the bylaws of Shaneda Machine restated to remove Jodie as a director and to
leave himself as the sole director.








On
February 22, 2007, Jodie filed her first amended original petition for divorce,
requesting a disproportionate share of the community estate and naming Gryder
as a co-respondent.  She alleged in Paragraph 16:

Relief
from Third-Party for Fraudulent Transfer

Co-Respondent
is alleged to be the holder and/or owner of certain stock in Shaneda Machine,
Inc. that was fraudulently transferred by Respondent to Co-Respondent, Faron
Gryder, without consideration and/or for less than reasonably equivalent value. 
The purpose of the transfer was to defraud Petitioner=s property rights in that
property and/or Petitioner=s
separate property rights in that property, and Co-Respondent had notice of
Respondent=s intent to
injure Petitioner=s
rights.  Respondent has transferred to Co-Respondent certain stock in Shaneda
Machine, Inc. (emphasis added).

 

The prayer in Jodie=s first amended petition
requested the following:

 

Petitioner
prays that the Court find that the items were transferred to Faron Gryder in
fraud of Petitioner=s
right in those assets and that, after notice and hearing, the Court enter an
order setting aside the transfer as a fraud on the community and declaring
the assets to be the community assets of Petitioner and Respondent and/or
Petitioner=s
separate property (emphasis added).

 

On
April 10, 2007, Glenn, Jodie, and Gryder signed an MSA that set out in an
exhibit the one matter that was reserved for trial:

2.  
      Jodie Wright and her attorney . . . will agree to a new trial being
granted in the cause of action for fraud on the community against 3rd
Party Respondent, Faron Gryder; if the Court should find the
conveyance of stock shares in Shaneda Machine Inc. by Glenn Wright to Faron
Gryder constitutes a fraud on the community, Glenn Wright will pay to
Jodie Wright the sum equal to 50% of the value as determined by Jeannie McClure
ASA, 2/28/07, of the shares of Shaneda Machine Inc. awarded back to the
community estate after adjudication of that claim.  If there is a finding of no
fraud and Mr. Gryder prevails, the settlement set out herein will stand
(emphasis added).

 








On
April 30, 2007, one day before trial on Jodie=s
fraud on the community claim, Jodie filed a motion to limit evidence to the
issue of whether the transfer of Shaneda Machine stock was fraudulent and, if
so, whether one-half of the value of the shares would be paid to Jodie Awith the Court having
available remedies to impose constructive trust, void transfer, and/or money
judgment.@  On May 1,
Glenn and Gryder argued to the trial court that the MSA only reserved a claim
of actual fraud and did not encompass a claim for constructive fraud.  Jodie
argued that her earlier pleadings asserted claims for both actual and
constructive fraud and that the MSA, by its reference to a claim of Afraud on the community,@ reserved claims for both
types of fraud.  The trial court ruled that the term Afraud on the community@ in the MSA included constructive fraud.

Jodie=s counsel requested leave
to file a trial amendment to clearly set forth the issues to be tried and to
ensure that her pleadings complied with the MSA.  Glenn and Gryder objected and
argued that they were entitled to seven days notice of any amendments.  The
trial court ruled that Jodie could amend her pleadings; however, the trial
court postponed the trial until May 15.  That afternoon, Jodie filed a second
amended petition that set out specific details of her claims for constructive
fraud, actual fraud, and fraud on the community.  Her petition explicitly 
recognized that she was bound by the terms of the MSA, stating that, Ato the extent these
pleadings are contrary to that Mediated Settlement Agreement, the Mediated
Settlement Agreement shall prevail.@

After
receiving the second amended petition, Glenn and Gryder filed jury demands on
May 9. The trial court ruled that the demands were untimely because the
nearest setting would have to be in late August (changed later to October) and
would impair the court=s
docket.  Following a bench trial, the trial court found that, by transferring
the stock, Glenn had committed actual fraud, constructive fraud, and fraud on
the community and that Gryder had committed fraud on the community.  The trial
court awarded a money judgment of $318,500 to Jodie.  The trial court ordered
that the money judgment be secured with a lien, security interest, escrow
agreement, and UCC filing and ordered Glenn to additionally sign a promissory
note for $318,500; however, Jodie has conceded in her appellate brief that
these measures were inappropriate under the MSA.

                                                          Fraud
on the Community

In
their first issue, Glenn and Gryder argue that Jodie had breached the MSA and,
therefore, that Glenn had the right to rescind it.  Their principal contention
is that the MSA only reserved a claim for actual fraud.  We disagree.  The
parties= pre-MSA
pleadings were in many ways broadly phrased.  Jodie=s pleadings contain the term Aactual fraud,@ but they also raised a
constructive fraud or fraud on the community claim.  Jodie alleged:

[The Shaneda Machine
stock] was fraudulently transferred by [Glenn] to [Gryder] without
consideration and/or for less than reasonably equivalent value.  The purpose of
the transfer was to defraud [Jodie=s]
property rights in that property . . . and [Gryder] had notice of [Glenn=s] intent to injure [Jodie=s] rights (emphasis added).

 








A
fiduciary duty exists between spouses regarding the community property each controls. 
Zieba v. Martin, 928 S.W.2d 782, 789 (Tex. App.CHouston [14th Dist.] 1996, no writ).   The
breach of this duty is termed Afraud
on the community,@ a
judicially created concept based on the theory of constructive fraud.  Zieba,
928 S.W.2d at 789.  AFraud
on the community@ and Aconstructive fraud@ are essentially the same
tort.  In re Marriage of Moore, 890 S.W.2d 821, 827 (Tex. App.CAmarillo 1994, no writ). 
It is constructively fraudulent for one spouse to dispose of the other spouse=s interest in community
property without that spouse=s
knowledge or consent.  In re Marriage of DeVine, 869 S.W.2d 415,
428 (Tex. App.CAmarillo
1993, writ denied).

The
MSA referred to Jodie=s
fraud on the community cause of action, described a constructively fraudulent
action, and provided a fraud on the community remedy.  See Schlueter v.
Schlueter, 975 S.W.2d 584, 588 (Tex. 1998) (trial court can consider
fraudulent conduct as one of the factors in determining a just and right
division of the community and can award the wronged spouse a money judgment to
recoup his or her share of the community estate lost through the other spouse=s actions).  

Jodie=s second amended petition
breached the MSA by asking for additional remedies, and the trial court erred
by awarding them.  However, Jodie also pleaded that, if her petition was
contrary to the MSA, then it controlled.  Jodie=s
breach was not material, and it does not justify rescission because the
erroneously granted relief can be easily addressed.  Glenn and Gryder=s first issue is overruled.

Their
fourth, fifth, sixth, and seventh issues are also overruled because they are
all based on the assumption that Jodie breached the MSA by making Anew claims.@  In those issues, Glenn
and Gryder assert that the trial court erred in allowing Jodie to proceed to
trial on an amended pleading that asserted new claims that contravened the MSA,
that they did not have adequate time to prepare a defense to the Anew claims,@ that they did not have an
opportunity to do pretrial discovery on the Anew
claims,@ and that they
were entitled to request a jury in view of the Anew
claims.@  Not only did
Jodie not assert a new claim, but Glenn and Gryder have otherwise failed to
establish an abuse of discretion.  The parties had at least a year to conduct
discovery.  When Jodie requested leave to file a trial amendment, the court
reset the trial to begin fifteen days later.  During that time, neither Glenn
nor Gryder filed a motion for continuance or requested additional time to
conduct discovery.  Consequently, their complaint was not preserved for
review.  See Lebron v. Citicorp Vendor Fin., Inc., 99 S.W.3d 676, 681
(Tex. App.CEastland
2003, no pet.).  Additionally, because their jury requests were not filed until
May 9, they were untimely.  Tex. R. Civ.
P. 216.

 








                                         Legal
and Factual Sufficiency of the Evidence

In
their second and third issues, Glenn and Gryder contend that the evidence was
legally and factually insufficient to support the judgment in favor of Jodie. 
Again, they argue that it was reversible error for the trial court to have
found liability based on constructive fraud or breach of a fiduciary duty
because the MSA only reserved a claim for actual fraud.  We rejected this
position in their first issue.

The
credibility of the witnesses was crucial to the fact-finding process by the
trial court.  As the trier of fact, the trial court was the sole judge of the
credibility of the witnesses and the weight to be given their testimony.  Belew
v. Rector, 202 S.W.3d 849, 855 (Tex. App.CEastland
2006, no pet.).  In its findings of fact, the trial court expressly found that
the testimony of Glenn and Gryder was not credible.

Because
findings of fact in a bench trial have the same force and dignity as a jury
verdict, we review them for legal and factual sufficiency of the evidence under
the same standards we apply in reviewing a jury=s
findings.  Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).  When
reviewing the legal sufficiency of the evidence, we consider the evidence in
the light most favorable to the challenged finding and indulge every reasonable
inference that would support it.  City of Keller v. Wilson, 168
S.W.3d 802, 827 (Tex. 2005).  We must credit favorable evidence if a reasonable
factfinder could and disregard contrary evidence unless a reasonable factfinder
could not. City of Keller, 168 S.W.3d at 827.  We must determine whether
the evidence at trial would enable reasonable and fair-minded people to find
the facts at issue. Id.  The factfinder is the only judge of witnesses= credibility and the weight
to give to testimony.  See City of Keller, 168 S.W.3d at 819.

When
reviewing a challenge to the factual sufficiency of the evidence, we examine
the entire record, considering both the evidence in favor of, and contrary to,
the challenged finding.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
After considering and weighing all the evidence, we set aside the fact finding
only if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986).








In
a traditional fraud cause of action, a plaintiff must show six traditional
elements.  Stone v. Lawyers Title Ins. Corp., 554 S.W.2d 183 (Tex.
1977).  As between spouses, the six elements need not be shown.  A spouse
commits actual fraud if he or she transfers community property or expends
community funds for the primary purpose of depriving the other spouse of the
use and enjoyment of the assets involved in the transaction.  Horlock v.
Horlock, 533 S.W.2d 52, 55 (Tex. Civ. App.C
Houston [14th Dist.] 1975, writ dism=d). 
Actual fraud between spouses involves dishonesty of purpose or intent to
deceive.  Id. at 55.

There
was legally and factually sufficient evidence to support the trial court=s finding for Jodie on a
claim of actual fraud.  Glenn=s
intent to deprive Jodie of the use and enjoyment of community assets was shown
by his actions in draining their bank accounts (including Jodie=s savings account), quickly
transferring title to the Harley Davidson motorcycles to their sons, removing
Jodie as a director of Shaneda Machine, and transferring almost half of the
stock of Shaneda Machine to Gryder B
within days of Jodie=s
filing a divorce action B
without her knowledge or consent.  Glenn testified that he wanted Ato protect [himself]@ by draining their bank
accounts.  The trial court could infer that the purpose of Glenn=s transfer of the Shaneda
Machine stock to Gryder was to deprive Jodie of any interest in that company. 
Glenn=s actions
demonstrated an intent to deprive Jodie of as much of the community property as
possible.

The
evidence before the trial court was basically a swearing match between Glenn
and Gryder on the one hand and Jodie on the other.  Glenn and Gryder testified
that Glenn had agreed to transfer Aan
interest@ in Shaneda
Machine to Gryder as an inducement for Gryder to move from Dallas to Midland in
2003 to manage the company.  However, their testimony was not specific on the
amount of stock in Shaneda Machine, only that Gryder would get an interest. 
Glenn claimed that the conversation occurred in Jodie=s presence, which she denied.  Yet, Glenn did
not transfer any stock until March 17, 2006, and then it was a 49% interest. 
If there was an earlier conversation concerning some interest in the company,
there was no reference  to what percentage of the company that Gryder would own
or what he would pay for an interest in the company until October 2005. Both
Glenn and Gryder admitted that their Aagreement@ had never been in
writing.  Jodie testified that she had never had a conversation with anyone
about Glenn transferring stock to Gryder.  Jodie agreed that Gryder should have
an interest in the company, A[m]aybe
a little bit, but not 49 percent.@ 
Jodie also testified that it was not fair to her or their children for Glenn Ato transfer over $600,000
in value@ to Gryder,
an employee, as a gift.








Jimmy
B. Todd, the attorney for Shaneda Machine who prepared the documents for the
stock transfer, said that he did not recall whether he knew on March 17 that
Jodie had filed for divorce, but Glenn Aindicated
to [him] that  he was having family problems.@ 
Todd confirmed that Jodie was removed as a director on March 17, leaving Glenn
as the sole director.  Todd acknowledged that there was a buy/sell agreement
built into the bylaws of the corporation, explaining that a shareholder could
not sell stock to a third party without first offering the shares to the
corporation.  However, Todd testified that the shares were not offered to the
company because:  A[T]here
was no particular sale.  It was a transfer.@ 
That statement indicates that the Atransfer@ was for no consideration. 
Todd=s testimony does
not demonstrate that he knew much about the transaction, only that he had been
asked to transfer the stock and he complied.

Glenn
testified that he decided it was necessary to update his minute books to give
the stock to Gryder although he had not paid attention to the minute books for
ten years.  He did not deny that  he chose the time shortly after Jodie filed
for divorce to remove her as a director, leaving him the sole director of
Shaneda Machine.  Despite his actions on March 14 and 17, Glenn claimed that he
did not know that Jodie had filed for divorce on March 14.  Todd testified that
the minute books had been lost and that Glenn had requested that he recreate the
minute books.  Todd testified that his office was able to reconstruct the
minute books by making copies of what he had in the file.  Todd also testified
that Glenn had requested the minute books in January or February, but Todd did
not remember why the books were needed, only that it was about the time that
Glenn had purchased another company.  Todd=s
testimony does not support the testimony of Glenn and Gryder concerning any
agreement concerning the stock.  Todd admitted that Jodie had not been
contacted about the stock transfer.

Veda
Jones with Todd=s law
firm testified that she prepared the new stock certificate transferring stock
to Gryder.  She was familiar with the corporate documents of Shaneda Machine
and knew that Jodie had been a director until March 17 when Glenn was made the
only director.  She was not aware if Jodie was contacted about the stock
transfer.

Glenn
objects to the trial court=s
finding that he did not have sole management and control over the stock.  The
implication is that he believed that he was entitled to make the transfer to
Gryder as the sole manager of the stock because it was in his name.  Glenn
cites as his authority Tex. Fam. Code
Ann. ' 3.104
(Vernon 2006).  We agree with Glenn that the stock was subject to his
management and control.  We do not agree that Section 3.104 authorized him to
act without Jodie=s
consent.  As a director, Jodie was entitled to participate in a decision of
this magnitude affecting Shaneda Machine.  She was entitled to be consulted
before Glenn conveyed almost one-half of their principal company for no
consideration.








The
managing spouse may make moderate gifts for just causes to persons outside the
community.  Mazique v. Mazique, 742 S.W.2d 805, 808 (Tex.  App.CHouston [1st Dist.] 1987,
no writ); Hartman v. Crain, 398 S.W.2d 387, 390 (Tex. Civ. App.CHouston 1966, no writ). 
But a gift of community funds that is capricious, excessive, or arbitrary may
be set aside as a constructive fraud on the other spouse.  Mazique, 742
S.W.2d at 808; Horlock, 533 S.W.2d at 55.  The trial court obviously
concluded that this gift was excessive.

As
its title AProtection
of Third Persons@
reflects, Section 3.104 primarily addresses a community property transfer from
the standpoint of a third party.  In general, community property is subject to Ajoint management, control,
and disposition of the spouses unless the spouses provide otherwise by power of
attorney in writing or other agreement.@ 
Tex. Fam. Code Ann. ' 3.102(c) (Vernon
2006).  However, Section 3.104 provides a presumption to a third party where
community property is held in one spouses=s
name only.

To
rely on the presumption of Section 3.104, a grantee has to show three things:
(1) the property conveyed was presumed to be subject to the named spouse=s sole management; (2) the
grantee was not party to a fraud on the unnamed spouse; and (3) the grantee had
no notice of any lack of authority of the named spouse to convey the property. 
Section 3.104(b); Jean v. Tyson-Jean, 118 S.W.3d 1, 6 (Tex. App.CHouston [14th Dist.] 2003,
pet. denied).  Keeping in mind that the trial court found that Glenn and Gryder
were not credible witnesses, we cannot say that the trial court erred in
finding that Gryder failed to show that he was not a party to Glenn=s fraud on the community. 
However, Jodie agreed in the MSA that she was not seeking the Shaneda Machine
shares back, only a money judgment as part of her share of the community. 








It
is difficult to believe that Gryder did not realize that Jodie should have been
consulted about the transfer and that Jodie should have been there when the
transfer took place.  At a minimum, there should have been some evidence that
Jodie consented to the transfer since Gryder did not pay for the stock.  Gryder
knew that Jodie and Glenn had split up in Athe
first part of March@ 
and knew that, A[a]t
the end of March 2006,@
Jodie and Glenn were going through a divorce.    Gryder said that he had gone
to work for Shaneda Machine in 1982, that he became a vice president of the
corporation in 1984, and that he had known Jodie since 1982.  Glenn, however,
testified that Gryder came to work at Shaneda Machine in 1988, not 1982. 
Gryder testified that he left Shaneda Machine in 2000 because he had wanted an
interest in the company and had become very disgruntled.  He worked for his
brother-in-law in Dallas between 2000 and 2003 when he got a call from Glenn
asking him to return to Midland.  Gryder said that Glenn offered a $75,000
salary and Asome
shares in Shaneda.@ 
Gryder testified that he threatened to quit in October 2005 and that it was
then Glenn told him the interest would be 49%.  Gryder acknowledged that he
continued to work at Shaneda and that nothing happened until March 17, 2006. 
Nothing about their agreement was in writing.  Although Gryder had known Jodie
for years, he said that she did not participate in or discuss this transaction
with him.

Even
from their testimony, it is unclear when Glenn decided to give Gryder 49% of
the company.  In a portion of Glenn=s
deposition read during the trial, Glenn said that Gryder gave his resignation
about the time Glenn was being sued for divorce.  Glenn said he took Gryder
down to Todd=s office
and said, A[I]f you
get a percentage of this company are you going to stay?@  AAnd
he said, that=s all it
takes to make me stay.@ 
That testimony indicates that they agreed on the 49% interest on March 17,
2006.  At the time of trial, however, Glenn and Gryder testified that they had
agreed on the 49% interest the previous October.

Glenn
admitted that he knew there would be tax consequences to the transfer of
stock.  It would appear that a gift of this magnitude involved a substantial
gift tax payable by the community.  Glenn stated that Shaneda Machine was going
to take care of any taxes and that he had talked to Jodie about Shaneda Machine
paying the tax.  Glenn acknowledged that he had not told Michael Barth, the
CPA, about the transfer and that he did not refer to the transaction in the
2006 tax return.  Gryder also stated that he knew there would be tax
consequences but that he had not mentioned this transaction in his tax return.

A
presumption of constructive fraud arises when one spouse disposes of the other
spouse=s one-half
interest in community property without the other=s
knowledge or consent.  Massey v. Massey, 807 S.W.2d 391, 402 (Tex. App.CHouston [1st Dist.] 1991,
writ denied).  Glenn had the burden of proof to establish that the transfer of
the stock to Gryder was not unfair to the rights of Jodie.








Jeannie
McClure was the appraiser who had been appointed by the court to appraise the
companies owned by Jodie and Glenn.  McClure testified that, if Glenn had a
contractual obligation to convey stock to Gryder, the conveyance had a benefit
to the community estate to balance the detriment.  McClure believed that the
community estate gained at least as much as $477,750 by having Gryder in the
management of Shaneda Machine because his presence allowed Glenn to increase
the value of the other companies.  However, her belief would only be relevant
if the trial court had found that there was a contractual obligation to convey
Gryder the 49% interest when he moved back to Midland in 2003.  McClure
admitted that the Turbo companies had increased in value due to Glenn=s management and  the
improvement in the Midland economy since 2003.  She agreed that, if Gryder had
not been given the stock, the value of Shaneda Machine on February 28, 2007,
would still be $1,300,000.  Jodie testified that the transfer was not fair to
her because Glenn had transferred an interest worth $600,000 to Gryder as a
gift.  She said that she and Glenn Ahad
discussed that one day when he retired that my children would take over the
company and run it.@ 

The
trial court determined that the stock transfer was grossly unfair to the
community estate.  The trial court had before it the MSA.  Glenn was to receive
Turbo Specialties & Machine Co., Inc. and Turbo Custom Components, Inc.
valued at $1,010,000; World Sealing Corp. valued at $2,340; Permian Valve
valued at $119,201; and 51% of Shaneda Machine valued at $663,000.  In
determining whether the transfer of the 49% to Gryder was fair to the
community, the trial court could treat the community assets as including the
entire value of Shaneda Machine at $1,300,000  and could consider the fact that
Glenn still had control of the company.  In re Marriage of DeVine, 869
S.W.2d 415.

Under
the MSA, Jodie was to receive their home (net value of $517,400), her 401(k)
(worth $54,225), Glenn=s
401(k) (worth $114,800), and a $600,000 payment from Glenn.  Thus, earning
assets transferred to Glenn were valued at $2,431,541 and earning assets
transferred to Jodie were $769,025.  Even taking into consideration only the
net value of $663,000 for his remaining Shaneda Machine stock, Glenn was to
receive earning assets of stock worth $1,131,541 versus Jodie=s $769,025.  Had there been
no transfer of stock, the community would have had another $637,000 to divide.[1] 
Glenn=s transfer of
the stock to Gryder for no consideration was unfair to Jodie and the community
being divided.  Moreover, tax consequences of the transaction were not
considered by Gryder or Glenn.  The trial court did not err in finding that
Glenn=s intent was to
deprive Jodie of a significant portion of the community assets and that the
transfer was unfair to her.  We hold that the evidence was legally and
factually sufficient to support the finding that Glenn committed a fraud on the
community.  The second and third issues of Glenn and Gryder are overruled.

The
Agreed Measure of Recovery Under the MSA








In
Paragraph (i) of Glenn=s
eighth issue, he contends that the trial court erred in awarding Jodie $318,500
for Glenn=s fraud on
the community because it was an improper measure of recovery under the MSA. 
Glenn and Gryder argue that the value of the stock conveyed to Gryder was worth
$477,750 and that half of $477,750 is $238,875; therefore, $238,875 is the
amount that the trial court should have awarded Jodie.  The $477,750 number is
based on testimony by McClure at trial.  The attorneys for Glenn and Gryder
obtained McClure=s
agreement that a minority interest in a company is discounted for lack of
marketability and lack of control.  Viewing the value from Gryder=s standpoint, McClure
testified that she would take the fair market value of the entire business,
$1,300,000 and take 49% of that number.  Then she would take 75% of that number
(a 25% discount).  Thus, the value of the interest conveyed to Gryder was
$477,750.  But that is not what was agreed to by Glenn and Gryder in the MSA. 
The MSA provided:

If the Court should
find the conveyance of stock shares in Shaneda Machine Inc. by Glenn Wright to
Faron Gryder constitutes a fraud on the community, Glenn Wright will pay to
Jodie Wright the sum equal to 50% of the value as determined by Jeannie McClure
ASA, 2/28/07, of the shares of Shaneda Machine Inc. awarded back to the
community estate after adjudication of that claim.

 

We
agree with the trial court that this provision of the MSA meant that the court
was to value the shares from the standpoint of the community estate, not from
Gryder=s viewpoint. 
The court correctly started with the $1,300,000 value for Shaneda Machine, the
value determined by McClure as of February 28, 2007.  The trial court then
found that 49% of $1,300,000 equaled  $637,000 and that 50% of that value was
$318,500, the amount awarded to Jodie.

Although
we reach the same interpretation as the trial court based solely on a reading
of the text of the paragraph in the MSA, the surrounding circumstances at the
time of the MSA also support our conclusion.  We note that in her letter to the
Wrights dated March 28, 2007, prior to the mediation that resulted in the MSA,
McClure described her assignment:

McClure, Schumacher
& Associates, L.L.P. has been engaged to provide an opinion of fair market
value regarding the voting common shares of Shaneda Machine, Inc.

 

Further, we have
been asked to frame our opinion assuming the ownership at issue represents a
100% interest in Shaneda Machine, Inc.

 








The
MSA referred to McClure=s
valuation of Shaneda Machine as of A2/28/07.@  Glenn and Gryder agreed
that the sum to be paid to Jodie would be based on the value of the shares to
the community estate, not the value to Gryder.  When everyone agreed to the
MSA, they had only McClure=s
valuation of the companies to the community estate as of February 28, 2007;
there was nothing in the surrounding circumstances to even suggest that there
should be discounts.  Under the MSA, the shares were viewed as being Aawarded back to the
community estate,@ a
value of $637,000 (their value as of A2/28/07@), and Jodie was to be
awarded one-half of that amount ($318,500).  Glenn is bound by the MSA.  The
trial court did not deviate from the MSA.  Glenn and Gryder=s Issue No. 8(i) is
overruled.

Jodie=s Award of Support Pending
Appeal

The
divorce decree was signed by the trial court on May 25, 2007.  Glenn and Gryder
filed their notices of appeal.  Jodie filed a motion for temporary orders
pending appeal, asking for a minimum of $4,000 per month in support and for
exclusive occupancy of their home.  On June 25, the trial court ordered Glenn
to pay Jodie  temporary spousal support pending appeal of $4,400 per month and
granted Jodie the exclusive occupancy of their home.  Although the trial court
ordered that the temporary spousal support pending appeal should not be an
offset to its divorce judgment, Glenn argues that his payments for spousal
support should be credited against Jodie=s
award under the decree of divorce.  We agree.

Jodie
filed her motion for temporary orders for support under Tex. Fam. Code Ann. '
6.709 (Vernon 2006).  To now make those temporary support payments permanent
would mean that Jodie recovers a greater award than is allowed under their
MSA.  Glenn=s tenth
issue is sustained in part.

Attorney=s Fees 

In
the divorce decree, the trial court awarded Jodie a judgment of $60,000 against
Glenn for attorney=s
fees on appeal but decreed that Glenn would be entitled to a remittitur of $25,000
if he did not appeal to this court, a remittitur of $10,000 if a petition for
review was not filed with the Texas Supreme Court, and a remittitur of $25,000
if a petition for review was not granted by the Texas Supreme Court.  In Glenn=s eighth and ninth issues,
he argues that the trial court erred by granting an unconditional award of
appellate attorney=s
fees in the amount of $60,000 to Jodie because (1) the MSA did not reserve that
matter for the trial court=s
decision and (2) the award should have been conditioned upon success upon
appeal.  In his tenth issue, he argues that the award to Jodie for attorney=s fees on appeal should be
credited against her property award under the decree of divorce.








A
trial court does not have inherent authority to award attorney=s fees in a divorce
action.  Chiles v. Chiles, 779 S.W.2d 127, 129 (Tex. App.CHouston [14th Dist.] 1989,
writ denied).  Normally, attorney=s
fees for trial and appeal of a divorce are part and parcel of the property division. 
Carle v. Carle, 234 S.W.2d 1002, 1005 (Tex. 1950).  Therefore, Glenn
argues that the MSA was a full settlement as to the division of their estate,
except for the fraud on community claim, and any attorney=s fees were part of that
full settlement.

Jodie
argues that the MSA did not preclude an award of attorney=s fees because the
appellate fees were not contemplated by the MSA.  Jodie cites as support for
her position Butler v. Butler, No. 05-02-01631-CV, 2003 WL 21983218
(Tex. App.CDallas Aug.
21, 2003, no pet.) (mem. op.).  The husband and wife in Butler executed
an MSA.  A month later, the husband filed a motion to reform, clarify, or strike
the MSA.  The matter was submitted to arbitration as required by their MSA, and
the arbitrator entered an award resolving all property issues between the
parties.  The husband did not raise the issue of mutual mistake of fact in the
arbitration.  About four months after the arbitration, the trial court held a
hearing on the wife=s
motion to enforce the MSA and the husband=s
supplemental motion to reform or strike the MSA. The trial court approved the
MSA, confirmed the arbitration award, awarded attorney=s fees of $6,200 to the wife, and signed the
final decree of divorce incorporating the MSA.

The
husband in Butler appealed, arguing that he and the wife had mistakenly
overvalued their house and motor home at the time the MSA was executed.  The
court of appeals concluded that the trial court did not err in rendering the
divorce decree based on the MSA.  As to the award of attorney=s fees to the wife, the
court found that the husband had waived the issue by failing to provide any
discussion, argument, or authority to support his contention.  Tex. R. App. P. 38.1(h).  The court
added that, even absent waiver, it found no merit in the husband=s contention.  The court
noted that the MSA provided that each party was responsible for their own
attorney=s fees at the
time the MSA was executed and that the attorney=s
fees awarded by the trial court were based on testimony of fees the wife had
incurred after signing the MSA.

Jodie
argues that their MSA was silent regarding any attorney=s fees and that the trial court in this case
heard testimony on attorney=s
fees that she might incur on appeal.  However, her argument does not fully
answer Glenn and Gryder=s
contention.  Nor does her argument fully answer his contention that the trial
court erred by awarding Jodie $60,000 in unconditional appellate attorney=s fees.








Jodie
cites Keith v. Keith, 221 S.W.3d 156, 171 (Tex. App.CHouston [1st Dist.] 2006,
no pet.), for the proposition that an unconditional award of appellate attorney=s fees does not require
reversal; instead, the appellate court may modify the trial court=s judgment to make the
attorney=s fees
contingent upon the receiving party=s
success on appeal.  See also Houston Livestock Show & Rodeo, Inc. v.
Hamrick, 125 S.W.3d 555, 586 (Tex. App.CAustin
2003, no pet.).  We agree.  However, the record support for awarding attorney=s fees in this case is
unclear.  We cannot tell what fees relate to Jodie=s suit to enforce the MSA (a contract) and
what fees relate to the fraud on the community claim and constitute a division
of property precluded by the MSA.  Also, there is the question of how Glenn=s successful issues on
appeal should affect the award of appellate attorney=s fees to Jodie.

The
divorce decree ordered that each party was responsible Afor his or her own attorney=s fees, expenses, and costs
incurred as a result of legal representation through the trial of May 15, 2007
in this case.@  The
general rule in Texas is that each party is responsible for his or her own
attorney=s fees.  Turner
v. Turner, 385 S.W.2d 230, 233 (Tex. 1964).  Attorney=s fees are generally not
recoverable from the other party in the absence of a specific statutory or
contractual provision.  New Amsterdam Cas. Co. v. Tex. Indus., Inc., 414
S.W.2d 914, 915 (Tex. 1967); Turner, 385 S.W.2d at 233.

Tex. Civ. Prac. & Rem. Code Ann. ' 38.001(8) (Vernon 2008) provides that
a person may recover reasonable attorney=s
fees from an individual or corporation, in addition to the amount of a valid
claim and costs, if the claim is for Aan
oral or written contract.@ 
For example, Texas courts have held that a wife may recover attorney=s fees in connection with
her suit for breach of a contractual alimony agreement incorporated into a
final divorce judgment.  Conner v. Bean, 630 S.W.2d 697 (Tex. App.CHouston [1st Dist.] 1981,
writ ref=d n.r.e.). 
Once the right to attorney=s
fees is established, the court may award attorney=s
fees for any appeal.  Cap Rock Elec. Coop., Inc. v. Tex. Utils. Elec.
Co., 874 S.W.2d 92 (Tex. App.CEl
Paso 1994, no writ); Gunter v. Bailey, 808 S.W.2d 163, 165 (Tex. App.CEl Paso 1991, no writ).








An
MSA is a written contract.  Cayan v. Cayan, 38 S.W.3d 161, 165 (Tex.
App.CHouston [14th
Dist.] 2000, pet. denied) (Aa
[S]ection 6.602[2] agreement is
binding, i.e., irrevocable, and a party to one is entitled to judgment based on
the agreement@). 
Here, Glenn attempted to withdraw his consent to the MSA.  Jodie was not
required to file a separate suit for enforcement of the MSA.  Section 6.602 of
the Texas Family Code basically creates a procedural shortcut for the
enforcement of MSAs in divorce cases.  Butler, 2003 WL 21983218; Boyd
v. Boyd, 67 S.W.3d 398, 402 (Tex. App.CFort
Worth 2002, no pet.); Cayan, 38 S.W.3d at 166.  The trial court had the
authority to award Jodie attorney=s
fees attributable to her claim to enforce the MSA.[3] 
Praeger v. Wilson, 721 S.W.2d 597 (Tex. App.CFort Worth 1986, writ ref=d n.r.e.).  Thus, the trial
court was authorized to award appellate attorney=s
fees related to Jodie=s
Asuit to enforce@ the MSA.  Those fees are
separate from Jodie=s
award under the MSA.  However, we are unable to tell from the record what
amount of attorney=s
fees were attributable to Jodie=s
suit to enforce the MSA.

Had there been no attempt by Glenn to withdraw from the
MSA, the only basis for awarding attorney=s
fees to Jodie would have been under the trial court=s equitable powers to make a just and fair
division of the marital estate.  Carle, 234 S.W.2d at 1005; Chiles,
779 S.W.2d at 129.[4]  Jodie and
Glenn agreed in the MSA on the just and fair division of the marital estate
with the only question left being Jodie=s
claim of fraud on the community.  An award of trial or appellate attorney=s fees to Jodie for trying
the fraud on the community claim is beyond the MSA.  Again, we are unable to
tell from the record the amount of the appellate attorney=s fees related to the fraud
on the community claim.     Glenn=s
eighth, ninth, and tenth issues are sustained in part and overruled in part. 
We remand to the trial court for a determination of the amount of attorney=s fees that Jodie is
entitled to in light of the respective successes of the parties on appeal to
this court, the amount of attorney=s
fees attributable to Jodie=s
suit to enforce the MSA, and the amount of attorney=s fees attributable to Jodie=s claim of fraud on the
community.  The attorney=s
fees relating to Jodie=s
claim for a disproportionate share due to the fraud on the community should be
credited against her share under the MSA.  Attorney=s fees relating to Jodie=s suit to enforce the MSA
should be a separate award.

Additional Issues








Jodie
has agreed that both Glenn and Gryder are  correct in Issue No. 8(ii) and that
Glenn is correct in Issue No. 8(iii).  The trial court should not have required
Glenn to sign a promissory note in addition to the money judgment of $318,500,
and the money judgment should not have been secured by a lien, security
interest, UCC filing, or stock escrow agreement.  We agree in part with  the
ninth issue.  The trial court=s
judgment should be reformed to set contemporaneous deadlines for delivery of
documents; the deadline for payment of the money judgment of $318,500 should be
deleted; the provision purporting to secure the money judgment should be
deleted; the provision for a promissory note should be deleted; and the
provision concerning security agreements, UCC filing statements, and stock
escrow agreements should be deleted.  The remaining arguments are overruled.

Although
neither party has addressed the issue, we note that the record indicates that
both parties have accepted benefits under the trial court=s judgment.  Normally, a
litigant cannot treat a judgment as both right and wrong, and if he has
voluntarily accepted the benefits of a judgment, he or she cannot afterward
prosecute an appeal therefrom.  Carle, 234 S.W.2d at 1004.  This divorce
needs to be concluded.

This
Court=s Ruling

We
affirm the trial court=s
award to Jodie of $318,500 for her fraud on the community claim.  We remand to
the trial court for a determination of the attorney=s fees that should be awarded to Jodie and for
a reformation of the decree of divorce that is consistent with this opinion.

 

 

TERRY McCALL

JUSTICE

 

March 26, 2009

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]Apparently, that is why the parties agreed that, if the
court found a fraud on the community, Jodie was to receive a sum equal to 50%
of the value as determined by McClure on February 28, 2007.  McClure valued
Shaneda Machine at $1,300,000, and the MSA provides that, if there was a fraud
on the community, the shares are Aawarded
back to the community estate@ for purposes of
determining the sum to be awarded to Jodie.





[2]Tex. Fam. Code Ann. ' 6.602 (Vernon 2006).





[3]Tex. Civ. Prac. & Rem.
Code Ann. '
38.002 (Vernon 2008) requires that, to recover attorney=s fees under this chapter, the claimant must present
the claim to the opposing party.  The purpose of claim presentment is to allow
the person against whom the claim is asserted an opportunity to pay the claim
within thirty days and avoid an obligation for attorney=s fees.  Presentment was unnecessary under the
circumstances of this case.





[4]The court in Butler found that the appellant had
waived the point.  The statements by the court in Butler are consistent
with our conclusion.  The wife in Butler was entitled to attorney=s fees for her Asuit
to enforce the MSA.@  As the Butler court noted, ASection 6.602 provides a procedural shortcut for the
enforcement of MSAs in divorce cases, eliminating the need for a separate suit
to enforce the [MSA].@  Butler, 2003 WL 21983218 at *1.